## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **MARISSA M. DRURY-JENKINS**<br>**9102 Hanley Court**<br>**Waldorf, Maryland 20603**<br><br>*Plaintiff,*<br><br>v.<br><br>**REGENCY FURNITURE OF BRANDYWINE, INC.,**<br>**7900 Cedarville Road**<br>**Brandywine, Maryland 20613**,<br><br>&<br><br>**REGENCY MANAGEMENT SERVICES, LLC,**<br>**7900 Cedarville Road**<br>**Brandywine, Maryland 20613**,<br><br>&<br><br>**REGENCY FURNITURE, INC.,**<br>**7900 Cedarville Road**<br>**Brandywine, Maryland 20613**,<br><br>&<br><br>**ABDUL AYYAD**<br>**7900 Cedarville Road**<br>**Brandywine, Maryland 20613**,<br><br>*Defendants.* | Case No. 16-3066<br><br>Judge _____<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT
### (TITLE VII, 42 U.S.C. § 1981)

## I.   PARTIES

1.      Plaintiff Marissa Drury-Jenkins ("Drury-Jenkins") is a Filipina-American woman who was employed by Defendants between September 2011 and September 3, 2012.

2.      Defendant Regency Furniture of Brandywine, Inc., through its trade name "Regency Furniture" identified itself as Drury-Jenkins' employer by responding to Drury-Jenkins' charges of discrimination which were filed with the Equal Employment Opportunity Commission ("EEOC").

3.      Upon information and belief, Defendant Regency Furniture, Inc., owns and controls Defendant Regency Furniture of Brandywine, Inc.

4.      Defendant Abdul Ayyad ("Ayyad") is the President of Regency Furniture of Brandywine, Inc. as well as Regency Furniture, Inc.

5.      Defendant Regency Management Services, LLC identified itself as Plaintiff Drury- Jenkins' employer before the Maryland Department of Labor, Licensing, and Regulation, for purposes of adjudicating unemployment.

6.      Defendant Ayyad is the majority shareholder of each of the corporate defendants in this case.

7.      Collectively, Regency Furniture of Brandywine, Inc., Regency Furniture, Inc., and Regency Management Services, LLC, are referred to herein as "the Regency Defendants" and "Regency."

## II.   JURISDICTION AND VENUE

8.      The Court has jurisdiction of this matter pursuant to 42 U.S.C. § 2000 et. seq and 28 U.S.C. 1331, 1343(a).

9.      Venue is proper in the District of Maryland, because this case arises out of discrimination and reprisal committed by Defendants with respect to Plaintiff's employment occurred in this District.

### III.    EXHAUSTION OF ADMINISTRATIVE REMEDIES

10.     On or about November 3, 2012, Drury-Jenkins filed a discrimination charge with the Equal Employment Opportunity Commission.

11.     That charge alleges hostile work environment, termination, and the conversion of customers, all based on race, sex, age, national origin, and retaliation.

12.     On June 15, 2016, EEOC issued Drury-Jenkins a right to sue letter.

13.     Therefore, Drury-Jenkins is now free to exercise her private right of action in the U.S. District Court and to obtain a trial *de novo* under Title VII of the Civil Rights Act of 1964.

14.     Retaliation claims under 42 U.S.C. § 1981 are subject to a four-year statute of limitations, but require no administrative exhaustion.

15.     As it is no later than four years following the adverse action and hostile work environment that gives rise to the claims, under 28 U.S.C. § 1658, Drury-Jenkins is entitled to now bring her Section 1981 claims.

### IV.    FACTS

#### A.    Background

16.     The Regency Defendants are in the business of selling home furnishings.

17.     On September 3, 2011, Regency hired Drury-Jenkins as a Part Time Sales Representative at the Brandywine store.

18.     Drury-Jenkins' salary was mostly commission-based.

19.     On average, Drury-Jenkins earned commissions of $1,500.00 to $1,600.00 every 2 weeks.

20.     If Drury- Jenkins' customers were not improperly taken from her, she would likely have earned as much as $80,000.00 per year.

21.     Drury-Jenkins worked on average 25 to 30 hours per week.

22.     In some weeks, however, Drury-Jenkins worked 40 or more hours.

23.     These added hours were normally worked in weeks that abutted certain three-day weekend holidays such as Labor Day.

24.     Throughout Drury-Jenkins' tenure, Mr. Darrell Edwards' ("Edwards") job at the time was Assistant Manager.

25.     Edwards earned approximately $70,000.00-80,000.00 per year.

26.     Mr. Fela Fuller ("Fuller") had the title of Sales Manager.

27.     Throughout Drury-Jenkins' tenure, Fuller was Drury-Jenkins' direct supervisor.

28.     Ammad Ayyad had the authority of Acting or Apparent Store Manager, including hiring and firing employees, although he did not publicly identify that as his title.

29.     Upon information and belief, during the course of her employment, Drury-Jenkins was the only Filipino employee of Defendants at the Brandywine store.

**B.      Drury-Jenkins Was Subjected to a Continuous Hostile Work Environment of Offensive Sexist and Anti-Filipina Remarks**

30.     On every or almost every day of her employment, Drury-Jenkins was called "Clarita" by Edwards and/or Fuller.

31.     On numerous occasions, Drury-Jenkins responded by asking her to be called by her own name, but Edwards simply ignored this request

- 4 -

32.     Edwards, on multiple occasions, stated: "All Filipina who are prostitutes or whores are called Clarita."

33.     In the Philippines, the word "Clarita" is a slang term for a woman who has sex for money.

34.     At least once, Edwards indicated that he learned this from a close friend of his who had served in the United States military and was stationed in the Philippines.

35.     Edwards and Fuller also told Drury-Jenkins that a former Filipina employee at Regency who voluntarily had sexual relations with several managers at Regency, referred to herself as "Clarita."

36.     Edwards and Fuller both stated in her presence that "Asian pussy is tight" and so they each "wanted to try" Drury-Jenkins "to confirm it is true."

37.     Women of other ethnicities were not subjected to this level of abuse.

38.     Drury-Jenkins repeatedly rejected these advances, asserting they were not appropriate for the workplace.

39.     Owner Abdul Ayyad witnessed some of these comments and laughed about them.

40.     Manager Ammad Ayyad also witnessed some of these comments and laughed about them.

41.     Edwards and Fuller called Drury-Jenkins other offensive names such as "bitch", "Chinese yin-yang" (a term similar to the English insult "bitch.") and "Filipino Whore."

42.     Drury-Jenkins was also called "elephant face" and "pancake face."

43.     Edwards and Fuller were quick to associate Drury-Jenkins with other Asians.

44.     For instance, when Asian customer came in, Edwards and/or Fuller would often say, "here is another yin-yang" and assign the customer to Drury-Jenkins.

45.     Conversely they would insist on working with her African-American customers regardless of Drury-Jenkins success at working with customers of a variety of ethnicities.

46.     Edwards and Drury-Jenkins' referred to Asian customers as Yin-yang, including individuals from Vietnam or Laos.

47.     These sorts of comments were made every day, several times a day.

48.     Some of these offensive remarks, such as yin-yang, were made in front of customers.

49.     On multiple occasions, Edwards and Fuller would comment about Drury-Jenkins' outfit, stating, "I know that she wore that for me."

50.     Edwards' offensive remarks went so far as to say in front of several employees, "hey, Marissa, is it true that Asian people's pussy is vertical?"

51.     Edwards' offensive remarks included assertions like: "I like Filipino girls because they are small— it makes my penis look big."

52.     On numerous occasions, Drury-Jenkins responded to Fuller by stating something along the lines of: "I am your employee; this is not the right way to talk."

53.     Defendant Abdul Ayyad would appear at the least once during most holiday weekends.

54.     During the visits, he would observe Edwards or Fuller make one or more of these insulting comments.

55.     His typical reaction was to laugh, smile, smirk, or chuckle.

56.     On several occasions, Mr. Fuller specifically directly propositioned Drury-Jenkins by stating things like: "I don't think your husband is satisfying you; let me lick your pussy."

57.     Comments like these were made multiple times a day, on almost every day of Drury-Jenkins' employment.

58.     Drury-Jenkins never said anything or did anything to indicate that she invited or welcomed these comments.

59.     Other derogatory remarks made to Drury-Jenkins include asserting that she met her husband at a whore house, and asking her in front of others whether Filipinos eat dogs daily.

60.     Edwards also made offensive assertions like: "why do American military men marry "Filipino bitches?"

61.     Sexual related comments included things like: "bet your pussy smells so good and so fresh."

62.     On March 24, 2012, Fuller asked Drury-Jenkins to provide her a photo of her "pussy."

63.     This "request" was made again on April 7, 2012, along with an additional request that she join him in the bedroom department and allow him to touch her.

64.     On May 19, 2012, Mr. Fuller again propositioned Drury-Jenkins.

65.     On June 10, 2012, Fuller again told Drury- Jenkins that he wanted to "play with [her] pussy" and show [her] that he can make [her] happy and suck his dick at the same time."

66.     He further repeatedly asked Drury-Jenkins to go to the bathroom and take a picture of her private parts.

67.     On most days of Drury-Jenkins' tenure, Fuller taunted Jenkins by calling her a "Filipino whore" and "yin yang."  On many occasions, he would additionally make motions with his tongue that would appear to imitate the act of cunnilingus, stating "I know you like it" and "if you give me some of that, all your problems would disappear."

**C.      Drury-Jenkins was Bullied into Purchasing Bootlegged CD'S and DVDs**

68.      Edwards and Fuller maintained a practice of offering CDs and DVDs of music and movies to customers as an incentive to purchase.

69.      Upon information and belief, these CD's and DVD's were not being sold or provided legally, but were "bootlegged" or otherwise obtained illegally.

70.      Edwards pressured Drury-Jenkins to purchase music CD's.  He would occasionally tell Drury-Jenkins that she was "required" to purchase a CD, usually with threatening language such as "you must buy a CD today" or there would be consequences if she didn't purchase a CD or DVD.

71.      His voice was often raised and firm when he said these things.

72.      In order to obtain some relief from the above-described harassment, Drury-Jenkins would sometimes make a purchase.

73.      The harassment of Drury-Jenkins was decreased on those dates she purchased on movie or music.

**D.      Drury-Jenkins' Attempts to Obtain Relief Through Protected Protests Were Repeatedly Rebuffed**

74.      Sherrie Groce served as the Director of Human Resources at Regency.

75.      In addition to verbally informing Fuller and the Groce that she was offended by the discriminatory treatment inflicted upon her, Drury-Jenkins protested in writing no less than six times, five of which were sent via certified mail, or another equally verifiable method.

76.      These Protests were consummated on April 8, June 12, July 9, July 16, July 20, and July, 2012, by expression to the Owner of Regency Furniture, Mr. Abdul Ayyad.

77.     Thus, on April 8, 2012, Drury-Jenkins objected to owner/Defendant Abdul Ayyad in writing regarding "sexual harassment," that Fuller had "physically touch[ed] [her] at the bedroom area dept."

78.     Drury-Jenkins never received any response.

79.     As a result of the lack of response, Drury-Jenkins re-sent the 4-8-2012 letter to Abdul Ayyad, but still got no response.

80.     On June 10, 2012, Drury-Jenkins sent Fuller a text message objecting to the sexual harassment and that Edwards was also "stealing her sales."

81.     On many occasions, when Drury-Jenkins was next in line, Edwards would approach her prospective customers and state something to those customers such as: "don't worry about her; you are dealing with me now."

82.     On July 8, 2012, there was an argument among Edwards, Al Aidara, Catherine Williams, and Barry Saed regarding the Up-system.

83.     The Up-system refers to the principle that walk-in customers are assigned to salespeople based on the salespeople's arrival times., e.g., the first sales person to arrive gets the first customer, second to arrive gets the second customer, and so on.

84.     Edwards had a practice of not complying with the protocols of the Up-system. He would routinely approach customers, even if he was not next in line.

85.     Fuller then entered the fray and instructed everyone to allow Edwards to do what he wanted.

86.     Following the July 8 argument, Edwards proclaimed to Drury-Jenkins: "I know where your husband met you, from a whore house in the Philippines."

87.     He also called [her] a "Filipino whore".

88.     Shortly thereafter, Edwards made verbal threats towards Drury-Jenkins that he would "fuck [her] up, [her] mother, [her] daughter and [her] car," and that [she] should be very careful as he has a lot of friends that could actually fuck [her] up.

89.     Drury-Jenkins was very distressed from this taunting and made several attempts to visit the office of Sherri Iies, the store's sole Human Resources professional.

90.     Groce's office remained locked on most days and at most times, so that frequently an employee could only access her office when the door was open.

91.     On the occasion of July 8, 2012, Fuller followed Drury-Jenkins to Groce's office. On the way, Fuller threatened: "if you say anything to her, you will lose your job."

92.     He further proclaimed: "I know what club you used to work at in the Philippines."

93.     In a written memo to Groce, Drury-Jenkins protested this July 8 verbal harassment and hostility.

94.     She further explained that Edwards had a practice of stealing her customers.

95.     On or around this same day, a manager presented Drury-Jenkins with a document that indicates that Fuller was convicted of being on the sex-offender registry due to a conviction for second-degree rape.

96.     On July 14, 2012, after Fuller falsely told HR that Drury-Jenkins started fights, she was suspended for two weeks without pay.

97.     By this time, Drury-Jenkins had already expressed that she had been sexually harassed and even inappropriately touched.

98.     However, her letters to management had been ignored.

99.     In a July 18, 2012 letter to Abdul Ayyad, Drury-Jenkins requested some assurance of her safety in light of the verbal threats and sexual which Edwards and Fuller were inflicting upon her.

100.     On July 20, 2012, Drury-Jenkins requested a meeting with Abdul Ayyad regarding the harassment of July 8, 2012.

101.     She was never granted the requested meeting.

102.     On August 3, 2012, Drury-Jenkins wrote another letter to Abdul Ayyad recounting a series of harassing incidents, again indicating that she feared for her safety.

103.     On August 3, 2012, Drury-Jenkins wrote Human Resources Director Groce that she felt ill and depressed as a result of the employer's denial of the truth behind her complaints.

104.     Her correspondence specifically alleged that she "fe[lt] that Mr. Fela Khem Ali Fuller and Mr. Darrell Edwards [were] protected by Regency Human Resources." She added that she felt that she was being "singled out[,]" and that though she was the victim she was "the one who [was] being questioned."

105.     In this complaint letter, Drury-Jenkins requested two weeks off of work in order to address the depression that had resulted from the mistreatment inflicted upon her at work.

106.     On August 3, 2012, David Hu, Vice President of Operations, questioned Drury-Jenkins about her protected protests.

107.     Hu told Drury-Jenkins that no witnesses had said they never saw any of the alleged offending incidents occur.

108.     That was false.

109.     In fact, Hu knew that employee Darryl Sisson had seen the harassment, since Sisson told Hu so.

110.    Also, when questioning Drury-Jenkins, Hu stated: "are you kidding me?  Fela is sexually harassing you? Look at you? You are fat; these are all lies."

111.    On August 4, 2012, following a meeting with David Hu, Drury-Jenkins wrote again to Groce.

112.    She repeated that she was feeling depressed on account of the workplace harassment, including repeatedly being called a "Filipino Whore," and having to repeatedly rebut sexual advances.

113.    Drury-Jenkins also explained in that correspondence, that she did not feel comfortable discussing the facts with Hu because of Hu's admissions that he did not have any experience dealing with sexual harassment issues.

114.    Drury-Jenkins also explained in that correspondence, that she continued to fear for her safety.

115.    In addition, Drury-Jenkins noted that she was informed by a manager that Fuller was on the sex offender registry.

116.    On or around this same day, she wrote to Hu, specifying that the employer was violating Title VII of the Civil Rights Act, by not addressing her complaints and her rights.

117.    In this document, Drury-Jenkins alleged that her protests pertained to discrimination inflicted on account of her sex and Filipino origin and ethnicity. It specifically cited Title VII of the 1964 Civil Rights Act.

118.    Drury-Jenkins' correspondence further stated that she had "written [him] numerous times but no response."

119.    In fact, Drury-Jenkins sent the following UPS letters to Defendant about the mistreatment, including discrimination, inflicted upon her:

120.    1. April 8, 2012— Sent by regular mail only; hard copy received by Duty

Manager Berry Saedi in behalf of Management;

121.   2. June 12, 2012— UPS Tracking: MMCCONOEFK1FJ- 1Z7R37261313608391-

Received by Graf on 6/13/2012;

122.   3. July 9, 2012— UPS Tracking: MMCCONOFVWC54-1Z7R37260313772893-

Received by Graf on 07/10/2012;

123.   4. July 16, 2012 UPS Tracking: MMCCON053TC54-1z7R37260347150876 -

Received by Pingator on 07/17/2012;

124.   5. July 20,2012— UPS Tracking: USPS-7009-1680-0001-3067- Received on

07/21/2012;

125.   6. July 23, 2012— UPS Tracking: MM7JQEZVG 1 CSX- lZX548814220160995

Received by Glasser on 07/24/2012.

**E.   Drury-Jenkins Was Ultimately Terminated After She Sought Police Protection from Retaliatory Violence**

126.   On September 3, 2012, just as many times before, Edwards passed Drury-Jenkins

several times and stated, "Filipino whore bitch."

127.   On this same day, Edwards threatened Drury-Jenkins with violence, stating that

someone would "fuck up [her] car" and that she "shouldn't be surprised if someone comes to

[her] house and shoots her in the head."

128.   Fuller also threatened to kill her, and then grabbed her shirt.

129.    As a result of these threats, Drury-Jenkins called 9-1-1.

130.   The police came to the store in response to her call.

131.   After the police left, Ammad Ayyad told Drury-Jenkins: "if you can't handle it,

get out and go home."

132.    Ammad Ayyad also said: "Get the fuck out and don't come back to this property ever again; you embarrassed us by calling 9-1-1!"

133.    Ammad Ayyad further told Drury-Jenkins: that: since she "hired a Lawyer and called 911," [she was] no longer welcome to work in their family business.

134.    Defendants never informed or in any way implied to Drury-Jenkins that they were rescinding the instruction to "get the fuck out and don't come back to this property ever again," thereby consummating their termination of her employment.

135.    Nor did Defendants ever tell her that she was again welcome to work for them, despite having hired a lawyer and called 9-1-1.

136.    As a result of Defendants' behavior and instructions to "go home" and "not come back[,]" Drury-Jenkins's employment had been terminated, and she suffered resulting financial damages.

137.    On September 4, 2012, Judge Kenneth A. Talley issued Temporary Peace Orders against Fuller and Edwards.  The Orders set a Final Peace Order Hearing for September 11, 2012.

138.    On September 11, 2012, Ms. Drury-Jenkins obtained a final peace order against Fuller, which states: "there is clear and convincing evidence that within 30 days before the filing of the petition, the Respondent… placed [Ms. Drury-Jenkins] in fear of imminent serious bodily harm."

139.    Edwards was ultimately, on or about September 12, 2012, charged with second degree assault due to the acts of this day.

140.    Defendants never informed Drury-Jenkins that they were reversing their decision that she must "get the fuck out" of their store and not come back "ever again," Defendants assert that her employment was not terminated.

141.    Defendants never attempted to contact Drury-Jenkins after September 3.

142.    Defendants never informed Drury-Jenkins that they thought she was absent without leave after September 3.

143.    Defendants never informed Drury-Jenkins that she had been absent after September 3, or inquired as to when she would be returning to work.

144.    Defendants never offered to reassign Drury-Jenkins so that she could have worked under the supervision of a manager against whom she did not have a Peace Order.

145.    On October 26, 2012, Judge Robert C. Nalley issued a Final Peace Order against Fuller. It states that the basis for the order is that: "1. there is clear and convincing evidence that within 30 days before the filing of the Petition, the Responded committed the following act: harassment; 2. That there is clear and convincing evidence that Respondent is likely to commit a prohibited act in the future."

146.    As a result of Defendants' treatment of Drury-Jenkins, she has suffered substantial economic injury and mental distress.


**V.    STATEMENT OF CLAIMS**

**COUNT I: WRONGFUL SUSPENSION ON JULY 14, 2012, MADE UNLAWFUL BY TITLE VII, ON ACCOUNT OF RACE, SEX AND PROTECTED ACTIVITY, BY THE REGENCY DEFENDANTS**

147.    Drury-Jenkins incorporates all above paragraphs by reference.

148.    42 U.S.C. § 2000e et seq. (Title VII of the 1964 Civil Rights Act) forbids discrimination against an employee because she has opposed any practice made unlawful employment practice by these statutes.

149.    By suspending Drury-Jenkins on July 14, 2012, without pay, because of her race, sex, and protected activities, the Regency Defendants violated Title VII.

150.    Defendants' actions were taken with malice and/or in reckless disregard to

Plaintiff's rights.

**COUNT II:  HOSTILE WORK ENVIRONMENT MADE UNLAWFUL BY TITLE VII AND 42
U.S.C. § 1981, ON ACCOUNT OF RACE, SEX AND PROTECTED ACTIVITY,
BY ALL DEFENDANTS**

151.    Drury-Jenkins incorporates all above paragraphs by reference.

152.    As discussed above, Drury-Jenkins suffered from a hostile work environment

that was instigated against her due to her sex, race and protected protests against prior

harassment and mistreatment.

153.    The hostile work environment clearly rose to the level of severe and/or

pervasive.

154.    The hostile work environment included being inappropriately touched, demands

for sex, demands for sexual photos, racial insult and even death threats.

155.    The hostility further included being suspended on July 14, 2012, and having her

complaints ignored.

156.    Drury-Jenkins opposed the harassment from which she was suffering, but it

continued through the end of her employment.

157.    Her opposition included both verbal and written protests received by

management.

158.    42 U.S.C. § 2000e et seq. (Title VII of the 1964 Civil Rights Act), forbids

discrimination against an employee because she has opposed any practice made an unlawful

employment practice by these statutes.

159.    42 U.S.C.§ 1981 forbids discrimination again an employee because she has

opposed discrimination based on race or ethnicity.

160.     By creating a hostile work environment and failing to correct the environment even after she protested repeatedly, Defendants unlawfully discriminated and retaliated against Drury-Jenkins.

161.     Defendants' actions were taken with malice and/or in reckless disregard to Plaintiff's rights.

## COUNT III: TERMINATION MADE UNLAWFUL BY TITLE VII AND 42 U.S.C. § 1981, ON ACCOUNT OF RACE, SEX AND PROTECTED ACTIVITY, BY ALL DEFENDANTS

162.     Drury-Jenkins incorporates all above paragraphs by reference.

163.     As discussed above, Drury-Jenkins suffered from a hostile work environment that was instigated against her due to her sex, race and protected activity.

164.     The hostile environment included repeated insulting references to her sex and race, inappropriate touching, demands for sex and sexual photos, and even a death threat.

165.     The hostile work environment clearly rose to the level of being "severe or pervasive" as required by Title VII.

166.     Drury-Jenkins opposed the harassment and hostile environment inflicted against her by Defendants, but it continued through the end of her employment.

167.     Drury-Jenkins was informed on July 14, 2012 that she was suspended for continuing to protest the hostile environment.

168.     Defendants then informed Drury-Jenkins, through Manager Ammad Ayyad, that she was being fired because she "hired a lawyer and called 9-1-1."

169.     42 USC § 2000e *et seq.* (Title VII of the 1964 Civil Rights Act) and 42 U.S.C. § 1981 forbids firing an employee because of her race, sex or as retaliation because she has opposed any practice made an unlawful employment practice by these statutes.

170.     By terminating Drury-Jenkins due to her race, sex and protected protests, Defendants unlawfully discriminated and retaliated against Drury-Jenkins.

171.     Indeed, Ammad Ayyad, Defendant's agent, directly admitted a motivation for firing Drury-Jenkins—hiring a lawyer-- which is unlawful under Title VII and 42 U.S.C. § 1981.

172.     Defendants' actions were taken with malice and/or in reckless disregard to Plaintiff's rights.

## VI.     REQUEST FOR RELIEF

**WHEREFORE, the Plaintiff, Marissa Drury-Jenkins, prays that the Court grant her the following relief:**

(a)     Reinstatement to her position with full relief, including all lost pay, commissions and benefits, including but not limited to compensation for the period of the improper suspension, and for post-firing losses;

(b)     Compensatory damages, in an amount to be determined by the jury in accordance with the proof at trial, for the emotional and consequential harm caused by Defendant;

(c)     Punitive damages, in an amount to be determined by the jury in accordance with the proof at trial;

(d)     Prejudgment and post judgment interest;

(e)     Reasonable attorneys' fees, expenses and costs;

(f)     Reimbursement for all expenses incurred related to the case;

(g)     Posting of notices on Defendants' premises notifying employees that Defendant has violated the anti-discrimination laws, and that employees who report future violations may not be subject to retaliation; and

(h)     Such other relief as the court shall deem just and proper.

## VII.   JURY TRIAL DEMAND

The Plaintiff demands that this case be tried by a jury.

Respectfully submitted,

**THE GOLDSMITH LAW FIRM, LLC**

____/s/_____
Leizer Z. Goldsmith
Kyle G. Ingram
5335 Wisconsin Avenue NW Suite 440
Washington, D.C. 20015
Telephone: (202) 895-1506
Facsimile:  (202) 318-0798
Email: lgoldsmith@goldsmithfirm.com